# EXHIBIT A

# SYSTEMS GENERAL TERMS AND CONDITIONS AGREEMENT

<u>**Systems General Terms and Conditions Agreement**</u>

This Systems General Terms and Conditions Agreement (the "Agreement") is entered into by and between IGT Asia Pte Ltd having a place of business at 1 Changi North Street 1 #02-01 Singapore 498789, ("IGT") and Imperial Pacific International (CNMI) LLC trading as Best Sunshine International, having a place of business at Chalan Pale Arnold Road, Garapan, Saipan ("Customer").

**WHEREAS,** IGT offers certain products, systems and services for purchase, lease or license; and

**WHEREAS,** Customer desires to purchase, lease or license certain products, systems and/or services from time to time for certain Customer Locations;

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Definitions.</u>

   1.1. *Component Date.* Component Date is the date on which a component of Licensed Software has been approved for installation by the applicable regulatory agency and is available for patron use upon the applicable Location opening.

   1.2. *Connection License.* Connection License means a license which is based upon a per unit fee for the number of Gaming Devices and/or gaming tables which have access to the functionality of Licensed Software.

   1.3. *CPI.* CPI means the consumer price index supplied by the Government of Singapore.

   1.4. *Customer Location.* Customer Location means a legal gaming establishment owned, managed or operated by Customer, Customer's parent company or a subsidiary of Customer's parent company in Saipan.

   1.5. *Database Dictionary.* Database Dictionary means IGT's confidential and proprietary data dictionaries and data base schema relative to the applicable System.

   1.6. *Exhibit A.* Exhibit A means each numbered Exhibit A (e.g. Exhibit A-1) attached to this Agreement for the purpose of detailing the particular Products or Services and corresponding pricing.

   1.7. *Gaming Device.* Gaming Device means the (i) physical gaming machines operating on the casino floor of an applicable Location or (ii) for purposes of a table system the gaming tables on the casino floor of the applicable Location.

   1.8. *Hardware.* Hardware is hardware that is identified in Exhibit A to be purchased.

   1.9. *IGT Sales Order.* IGT Sales Order means the document, including a sales order, a contract change order, or a service ticket, generated by IGT for placing or changing orders for Products, parts thereof or services therefore.

   1.10. *License Fee.* License Fee means the amount payable for the license to the Licensed Software whether in the form of a Connection License fee, Subscription License fee or Site License fee.

   1.11. *Licensed Software.* Licensed Software means the software modules, in object code only, listed in Exhibit A along with related documentation and any firmware included in Products. Licensed Software includes Updates and Upgrades, if and when provided hereunder and any other modifications thereto.

   1.12. *License Term.* License Term for Site Licenses and Connection Licenses means the period of time during which Customer operates the applicable System unless earlier terminated in accordance with the provisions herein. License Term for Subscription Licenses means the term identified in an IGT Sales Order or addendum. Unless otherwise agreed in writing, following the initial License Term of a Subscription License, such License Term shall automatically renew on a monthly basis.

   1.13. *Live Date.* Live Date means the date on which the first Component Date occurs for a Location.

   1.14. *Location.* Location means the individual Customer Location that is procuring Products by executing this Agreement or an IGT Sales Order. As the context requires herein, Location shall mean either the physical casino location or the legal entity that operates the casino and signs this Agreement.

1.15. *Maintenance Effective Date.* Maintenance Effective Date means the date on which the Maintenance Fees shall commence which shall be ninety (90) days following Live Date unless otherwise agreed in a Sales Order or addendum.

1.16. *Maintenance Fee.* Maintenance Fee(s) means the fees determined in accordance with Section 4.4 for the maintenance services provided hereunder.

1.17. *Open Source Software.* Open Source Software means individual software components that are provided with the VMware Product, for which the source code is made generally available, and that are licensed under the terms of various published open source software license agreements or copyright notices accompanying such software components.

1.18. *Product.* Product means any product purchased, leased or licensed under this Agreement by a Location.

1.19. *Site License.* Site License means the license which is based upon a one-time fee per Location for access to the functionality of the applicable Licensed Software.

1.20. *Subscription License.* Subscription License means a license based upon a recurring fee to use Licensed Software for the finite period of time specified in an IGT Sales Order which may be renewed in accordance with the terms herein.

1.21. *System.* System means collectively the systems identified in this Agreement.

1.22. *Taxes.* Taxes means all applicable tariffs and other fees, including national, state and local sales taxes, use or value added taxes, goods and services tax, consumption tax, rental or lease tax, customs duties, import duties, levies, assessments, gaming taxes, withholding taxes or similar charges imposed by any governmental authorities associated with the purchase, lease, license, importation, installation, maintenance and operation of the Products excluding corporate income taxes.

1.23. *Update.* Update means any new build of the Licensed Software in which minor enhancements and bug fixes are the intent. An Update is typically signified as a release number to the right of the version number separated by a (".") point (shown as version. RELEASE).

1.24. *Upgrade.* Upgrade means any new build of the Licensed Software in which substantial enhancements and/or the inclusion of substantial new features or the addition of new modules are the intent. An Upgrade is typically signified as a number to the left of the release separated by a (".") point (shown as VERSION. release).

2. **Interpretation.** For all purposes of this Agreement the following provisions shall apply:

2.1. The words "herein," "hereunder," and other words of similar import, refer to this Agreement as a whole and not to any particular Section. The word "include" and its derivations means to include without limitation.

2.2. All references in this Agreement to the "sale" or "purchase" of software or intellectual property shall only mean the license or sublicense, as the case may be, to use such software or intellectual property pursuant to this Agreement.

2.3. IGT, Location and Customer may sometimes hereinafter be referred to collectively as the "Parties" and individually as a "Party."

2.4. This Agreement shall be construed without regard to the Party responsible for the preparation of the same, and shall be deemed to have been prepared jointly by the Parties; any ambiguity or uncertainty existing herein shall not be interpreted against either Party.

2.5. Each IGT Sales Order is hereby incorporated herein by reference and made a part hereof. Upon mutual execution of an IGT Sales Order, a Location shall be added as a Party hereto.

2.6. The following schedules are hereby incorporated by reference herein and made a part hereof: the Advantage, sbX and EZ Pay Schedule and the Exhibits A-D.

3. **Responsibilities.**

3.1. Customer shall provide a network to the connected Gaming Devices including furnishing and installing the wiring and the switches, hubs, datapoint connections and terminations for all such wiring, in conformity with the network and wiring specifications provided by IGT.

3.2. IGT shall install, configure and test the Licensed Software. If such installation requires the acceptance of third party software licenses, Customer authorizes IGT to accept such licenses on behalf of Customer.

3.3. IGT shall provide initial training (both pre and post Live Date) as set forth in Exhibit A. If not earlier completed, initial training shall be deemed complete on the date 8 weeks following Live Date.

3.4. IGT agrees to provide Customer professional services as part of the implementation of the System within the first 90 days after Live Date (the "Initial Services"). The Initial Services shall not exceed the total number of hours set forth in Exhibit A and shall be deemed completed on the 90th day following the Live Date.

4. **Payment Terms.** Customer shall pay the applicable License Fees and other fees or charges for Products and services provided hereunder. Customer is responsible for the payment of all Taxes. If available, Customer shall permit and enable automated billing through on-line connections. This Agreement is subject to Customer satisfactorily completing IGT's credit approval process and providing any security arrangements required by IGT.

4.1. *License Fees.* Payment obligations shall begin to accrue commencing on the Live Date or Component Date as applicable.

4.1.1. SUBSCRIPTION LICENSE FEE. Subscription License Fees are payable in advance on a monthly basis. The monthly payment shall be based on the amount set forth in Exhibit A. If additional Gaming Devices are connected to a System or Licensed Software, the per unit amount shall be added to the monthly payment. At the end of the Initial License Term and each year thereafter, the License Fees shall be adjusted to the then current list price unless otherwise mutually agreed in writing by the Parties.

4.1.2. SITE LICENSE. Site License Fees are payable on a per Location basis.

4.1.3. CONNECTION LICENSE FEE. Connection License Fee is the amount payable based upon the number of Gaming Devices connected to the System. In the event that additional Gaming Devices are connected to the System, Customer shall pay the per Gaming Device Connection License Fee set forth in Exhibit A for each additional Gaming Device in excess of the total Connection Licenses previously purchased by Customer.

4.2. *Purchased Hardware.* Customer shall purchase the Hardware listed on Exhibit A. Payment obligations shall accrue upon delivery to Customer Location.

4.3. *Travel Allowance.* Customer shall pay the travel allowance set forth in Exhibit A or as provided an IGT Sales Order (the "Travel Allowance") for the installation services. In the event that the scope of the installation services is modified in any manner, including as a result of adding or removing Licensed Software modules, the Travel Allowance shall be subject to adjustment; any such adjustment to the Travel Allowance shall be set forth in an IGT Sales Order.

4.4. *Maintenance Fees.* If Customer has elected to purchase maintenance services for Licensed Software, Customer shall pay the annual Maintenance Fee based upon the rate set forth in the Exhibit A or applicable Addendum. Maintenance Fees shall be payable in arrears quarterly installments.

4.4.1. CPI ADJUSTMENT. Annually, beginning with the first anniversary of the Maintenance Effective Date, the Maintenance Fee for the applicable Location will be adjusted by a percentage amount equal to the percentage change, upwards or downwards, in CPI. Such change in the CPI is to be initially measured from the Maintenance Effective Date to the first anniversary date of the Maintenance Effective Date with subsequent annual measurements taken from the date of the last annual adjustment.

4.4.2. CHANGE IN THE NUMBER. In the event Customer acquires an additional Licensed Software module or adds additional Gaming Devices requiring Licensed Software licenses for a Location, the Maintenance Fee for that Location will be increased in accordance with this Section 4.4. This change in the Maintenance Fee shall be effective upon the latter of the expiration of the warranty period (if any) for the new Licensed Software module or the addition of the Gaming Devices and billing will be prorated to be made co-terminus with the existing software maintenance billing cycle. In the event Customer removes a Licensed Software module or Gaming Devices for a Location, the Maintenance Fee for that Location will be decreased effective upon IGT's receipt of written notice of removal of the Licensed Software module

or Gaming Devices. Prepaid Maintenance Fees on the removed Licensed Software module or Gaming Devices, if any, will be credited to Customer upon the next maintenance billing.

4.5. *General.*

4.5.1. DEPOSIT. Customer shall make a nonrefundable deposit or down payment in the amount of fifty percent (50%) of the fees set forth in Exhibit A upon execution of this Agreement. The remaining balance in respect of Hardware will be due upon delivery and the remaining balance in respect of Licensed Software, Consulting Services, Project Management, Installation and Customer Training and Bonus Subscriptions as described in Exhibit A, will be due upon thirty (30) days after Live Date.

4.5.2. INVOICES. Unless otherwise provided in this Section 4, all payments shall be due and payable within thirty (30) days of the date of invoice.

4.5.3. EXPENSES. Customer shall pay the reasonable expenses, which may include per diem charges, incurred by IGT in performing on site services provided under this Agreement unless such expenses are related to installation services covered by the Travel Allowance.

4.5.4. SHIPPING. All Products purchased by Customer will be shipped Ex-Works IGT Singapore (Incoterms 2010) to locations designated by Customer. In all cases, Customer is responsible for all insurance and shipping costs.

4.5.5. INTEREST. Invoices for which payments are not received by IGT within thirty (30) calendar days of the date of the invoice will accrue default interest at the rate of eighteen percent (18%) per annum, provided that interest shall not exceed the maximum rate allowed under applicable law.

4.6. *Acceptance.* Hardware shall be deemed to be accepted upon shipment. Customer agrees to take delivery of a Product within one (1) year of execution of this Agreement; if such delivery is not taken, IGT may terminate the agreement to provide such Product. Licensed Software shall be deemed to be accepted upon the date Customer has provided a signed Acceptance Certificate to IGT on or before Live Date or Component Date as applicable. IGT will be deemed to have delivered and Customer will be deemed to have accepted the Licensed Software on such date. Customer agrees it will not utilise the Licensed Software in live operations without having first executed an Acceptance Certificate. "**Acceptance Certificate**" means the acceptance certificate to be provided by Customer to IGT in the form required by IGT.

4.7. *Taxes.*

4.7.1. GENERAL. Customer shall be solely responsible for the shipping and importation of the Products into Saipan and shall pay when due any and all Taxes applicable to the importation and operation of the Products and revenues received therefrom. Customer shall indemnify and defend IGT from and against any penalty, liability and expense (including reasonable attorneys' fees) arising from Customer's failure to remit such Taxes or from any delinquency with respect to such remittance.

4.7.2. WITHHOLDING TAX. Provided that a withholding tax does apply under the proper application of local laws, Customer is authorized and directed to deduct from payments otherwise payable to IGT and to remit to the applicable taxation authority any such withholding tax, as may presently, or after this Agreement takes effect, be imposed by law or regulation as an obligation upon Customer with respect to any such payments to be paid to IGT. Customer shall provide IGT with sufficient documentation to support such tax withholding and its timely remittance to the appropriate tax authorities. Customer shall submit such documentation to IGT concurrently with the applicable payment on or before the date on which the payment is due to IGT. Failure to remit such documentation shall be a material breach of this Agreement.

4.8 The parties acknowledge and agree that the Customer may purchase through IGT the same or similar System for operation at another Customer Location with written notice to IGT and upon payment by the Customer of additional fees and upon any additional terms and conditions as IGT may require for the provision of such System as specified in an IGT Sales Order for that Customer Location.

5. <u>License Provisions; Intellectual Property Rights</u>

5.1. *Software License.* Subject to the terms herein, including payment of License Fees, for each component of Licensed Software procured hereunder, IGT grants a non-exclusive and non-transferable license, without right to sublicense, to use the Licensed Software to operate the applicable Product at the Location for the License Term. Third party software is subject to the terms and conditions of the third party end user license agreement, if any.

5.2. *Exclusions and Restrictions.* These restrictions and exclusions shall apply to all grants of licenses hereunder.

    5.2.1. No source code or license to use source code is provided hereunder. Customer shall not reverse engineer, decompile, reverse compile or otherwise disassemble any Licensed Software. Customer shall not attempt to obtain the source code or other proprietary information from any Licensed Software.

    5.2.2. For Licensed Software subject to a Connection License, the maximum number of Gaming Devices permitted to be connected to the System and for which Customer is granted a license is limited to the number Connection Licenses purchased by Customer.

    5.2.3. Customer shall not sell, transfer, distribute, disclose or otherwise make available the Licensed Software, marked as "confidential" or that would be reasonably determined to be confidential, to any third party.

    5.2.4. Customer will not modify, or permit any person other than IGT to modify the Licensed Software or any part thereof.

    5.2.5. Customer must maintain on all copies of the Licensed Software all notices of patent rights, copyrights, trademark rights or other rights.

    5.2.6. Customer acknowledges that IGT may use, or require Customer to use security measures, including software locks, to limit access to use the Licensed Software and limit the ability to copy the Licensed Software consistent with Customer's use permitted hereunder.

5.3. *Intellectual Property.* Customer acknowledges that the Licensed Software, Updates, Upgrades, computer programs, system protocols and system documentation manuals supplied by IGT to Customer; all copies thereof and modifications thereto; and the intellectual property rights therein are proprietary to IGT and IGT's licensors, as applicable and title thereto remains in IGT and IGT's licensors, as applicable.

5.4. *Open Source.* Open Source Software licensing terms and conditions apply to the Open Source Software delivered with VMware Product. The sources and the licenses are made available for review and distribution at: http://www.vmware.com/download/open_source.html for the open source information and http://www.vmware.com/download/eula/ for the license. Licensee/Customer represents and warrants that it will comply fully with the terms and conditions of Open Source Software license agreements applicable to the VMware Product.

5.5. *Cashless patents.* There are no express or implied licenses granted to any cashless patents for the System being sold and the Software being licensed under this Agreement. As the System includes a non-transferable license to proprietary Software, the System shall not be exported out of the country in which it was originally installed without IGT's prior written consent; in the event of exportation, one or more patent licenses may be required. For more information on cashless licensing please feel free to contact IPPINFO@IGT.COM.

5.6. *Cashless Gaming System License.* Each gaming system obtained hereunder with cashless capability (a "Licensed Cashless Gaming System") is provided under a limited license to one or more of the following U.S. Patent Nos. 5,290,033; 5,265,874; 5,429,361; 5,470,079; 6,048,269; 6,729,957; 6,729,958; 6,736,725 and 7,275,991. Any use of a Licensed Cashless Gaming System constitutes the acknowledgement of an agreement to the following "Limited License":

    5.6.1. Licensed Cashless Gaming System License Rights. Licensed Cashless Gaming Systems are licensed solely for use to facilitate the cashless aspects of gaming machines that are separately licensed under these

patents ("Licensed Gaming Machines"). The use of a Licensed Cashless Gaming System to facilitate cashless transactions by an unlicensed gaming machine is an unlicensed use.

    5.6.2. Other License Limitations. Each Limited License is expressly limited to the original Licensed Cashless Gaming System (i.e., one serial number per license). A license may not be transferred from one gaming system to another. Any unauthorized transfer voids this license.

6. **Audit.** Throughout the Term, the Customer agrees to provide IGT with full access to the Location for the purpose of carrying out an inspection of the System and the Gaming Devices to confirm that all connections are properly licensed and that there is no unlicensed use of the System, subject to reasonable notice from IGT. In the event that a physical inspection of the System reveals that the System has unlicensed uses of a System or Software, IGT shall be entitled to immediately invoice Customer and Customer shall pay for the License Fees, Lease Payments and/or Maintenance Fees for the additional required licenses, connections or uses. In addition, if any inspection reveals that Customer has failed to properly account for and pay License Fees, Lease Payments and/or Maintenance Fees owing to IGT hereunder, and the amount of any License Fees, Lease Payments and/or Maintenance Fees which Customer has failed to properly account for and pay exceeds by five percent (5%) or more of the License Fees, Lease Payments and/or Maintenance Fees actually accounted for and paid to IGT, Customer shall also reimburse IGT for all reasonable expenses, which may include per diem charges, incurred in conducting such inspection. In addition to the above, if Customer has failed to properly account for ten percent (10%) of the License Fees, Lease Payments and/or Maintenance Fees, IGT may charge a penalty equal to twenty percent (20%) of the License Fees, Lease Payments and/or Maintenance Fees which were under-reported.

7. **Limited Warranty.** The following limited warranty shall apply to all products and services purchased or licensed pursuant to this Agreement.

    7.1. *Warranty.* IGT warrants that (i) for a period of ninety (90) days following Live Date or Component Date, as applicable, the Hardware and/or Licensed Software shall be substantially free from material defects and shall perform substantially in accordance with its specifications. The warranty is contingent upon the normal and proper use of the Hardware and/or Licensed Software in accordance with user documentation provided by IGT. The warranty shall be null and void to the extent any defects are caused by (i) any unauthorized modification, alteration, or revision of all or any portion of the Hardware and/or Licensed Software or any other equipment, programs or services which are the subject of this Agreement; (ii) any problem, error or malfunction attributable to Customer's software or hardware or third party software or hardware; (iii) damage caused by third parties; (iv) the failure of Customer to maintain environmental conditions consistent with best practices for information technology or (v) malfunctions caused by third party systems. Third party hardware and software are subject to the manufacturer's warranty, if any. The sole and exclusive remedy in the event of breach of the warranty is expressly limited to the restoration of the Hardware and/or Software to good working condition by adjustment, repair or replacement of defective parts, at IGT 's option. The warranty period for Licensed Software that is licensed on a per Gaming Device basis will begin at the Component Date. Subsequent installation or licensing of such Licensed Software for additional Gaming Devices will not receive a warranty period.

    7.2. *Disclaimer.* THE DATABASE DICTIONARY IS PROVIDED WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED. EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 7, THERE ARE NO OTHER REPRESENTATIONS, WARRANTIES OR CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. NO AFFIRMATION OF FACT, INCLUDING STATEMENTS REGARDING (1) SUITABILITY FOR USE OR PERFORMANCE OF THE LICENSED SOFTWARE OR SYSTEM, (2) PERCENTAGE HOLD OR PAR VALUE OF OR (3) GAMING DEVICE COMPLIANCE WITH ANY PROTOCOL SHALL BE OR BE DEEMED TO BE A REPRESENTATION, WARRANTY OR GUARANTY OF IGT FOR ANY PURPOSE.

8. **Licensed Software Maintenance Services.** If Location has purchased or subscribed to the optional maintenance services for Licensed Software, IGT shall perform the following maintenance services for such Licensed Software.

    8.1. *Defects.* Software code that prevents the Licensed Software from functioning as designed or as defined in its written specification ("Defects") will be corrected provided that IGT's representatives have full access, utilizing Customer's Virtual Private Network (VPN) connection via T1 line or most reasonable speed

available, to the Licensed Software in order to correct the defects. Defects will be classified and prioritized based on operational and regulatory impact. Following identification of a potential Defect, IGT will use commercially reasonable efforts to diagnose the problem and to promptly correct any problem which may have a material adverse effect on Customer's business. Notwithstanding the foregoing, resolutions of Defects and/or problems caused by operator error, environmental conditions beyond IGT's control, or hardware or software failures of components which were not purchased or licensed from and installed by IGT are subject to additional charges at the then prevailing rate for time and materials plus reimbursement for out of pocket expenses, which may include per diem charges. IGT will use its commercially reasonable efforts to obtain any required regulatory approval in an expedited manner.

8.2.   *Updates; Upgrades.* During the Term IGT will provide Customer with Updates, if and when available, consisting of one (1) copy of the Licensed Software and applicable documentation. If and when available, Upgrades may be provided by IGT to Customer at no charge or offered to Customer for an additional fee at IGT's option. Without limiting the foregoing, a maximum of one (1) full System Upgrade may be provided by IGT each year during the Term. IGT shall solely determine whether a new build of the Licensed Software constitutes an Update or an Upgrade and is under no obligation to incorporate in an Update any newly developed functionality. Updates and Upgrades will be provided only if (i) Customer has contracted with IGT to provide maintenance for both the Licensed Software component as well any base Licensed Software necessary for operation of such component and (ii) Customer is current with all sums due IGT. Customer acknowledges that maintaining Licensed Software after implementation of Updates or Upgrades may require computer hardware equipment or operating system upgrades, and that Customer is responsible for these costs. Customer is responsible for the reimbursement of IGT's reasonable expenses, which may include per diem charges, for on-site installation of Upgrades and Updates.

8.3.   *Training.* Initial training of Customer's personnel will be provided in a manner sufficient to instruct them in the use of any Update or Upgrade, at the time the Update or Upgrade is installed. If IGT provides an Upgrade for a fee, training fees may also apply. Such training will be in the form of documentation, instruction manuals or bulletins, telephone instruction, or on-site training, as deemed appropriate by IGT. Customer is responsible for the costs to keep its representatives trained and qualified. IGT will offer training at the then prevailing rates.

8.4.   *Support.* IGT will provide support for the Licensed Software. Such support will typically consist of troubleshooting Licensed Software issues and answering questions about how the Licensed Software can be used to meet the Customer's business and operational requirements. Access to IGT's support desk will be available on a 24 hours per day, 365 days per year basis. All issues reported to IGT's support desk will be handled in accordance with the SLO Schedule attached hereto as Exhibit E.

8.5.   *Internet.* IGT will provide licenses to Customer to access IGT's Internet based user support knowledgebase.

8.6.   *On-Site Assistance.* IGT and Customer will confer and jointly determine when on-site assistance is required. On-site assistance may be charged to the Customer at the then prevailing time and materials rate, if the fault is determined to be the result of operator error, environmental conditions beyond IGT's control, or hardware or software failures of components which were not purchased or licensed from and installed by IGT. Customer is responsible for the reimbursement of IGT's reasonable expenses, which may include per diem charges, for on-site assistance.

8.7.   *Conditions on Service.* Provision of maintenance services is contingent upon proper use of the Licensed Software. IGT may suspend or terminate its provision of maintenance services upon thirty (30) days prior written notice in the event that one (1) or more of the following occurs unless, within that time, Customer shall have removed the cause of termination in which case IGT shall rescind its notice of termination:

8.7.1.   CORRECTIVE PROCEDURES. Errors or defects in the Licensed Software which have been corrected by IGT, but Customer has failed or refused to install or perform the prescribed corrective procedures or programs provided to it by IGT.

8.7.2.   SOFTWARE OR DATABASE TAMPERING. Errors or defects in the Licensed Software are caused by or as the result of unauthorized alterations or revisions, or attempts to alter, revise or otherwise tamper with the

Licensed Software, software locks, or databases, including changes to table structures, indices, stored procedures, or any other unauthorized data import.

8.7.3.  INCOMPATIBLE EQUIPMENT. Errors or defects in the functioning of the Licensed Software are caused by or as the result of Customer's use of incompatible or non-approved equipment.

8.7.4.  CUSTOMER'S HARDWARE FAILS. Errors or defects in the functioning of the Licensed Software are caused by or as the result of Customer's computer hardware, cabling, Gaming Devices, gaming support equipment, electrical system and supply, or any other equipment used by the Customer to conduct its gaming operations.

8.7.5.  FAILURE TO PROVIDE ACCESS TO CUSTOMER'S PROPERTY. Errors or defects in the use, operation or functionality of the Licensed Software caused by Customer's failure to provide IGT with unrestricted access to all equipment locations, subject to Customer's security policies and any applicable regulatory restrictions governing such access.

8.7.6.  VPN. Customer agrees to maintain VPN access to the Licensed Software. In the event that Customer fails or refuses to provide VPN access, Customer shall pay for any required on-site assistance at the then prevailing time and materials rate, plus reasonable out-of-pocket expenses, which may include per diem charges.

8.8   *Exclusion.* Maintenance Services do not include day-to-day system operational maintenance such as database maintenance (e.g. defragmentation), system health checks or system monitoring. Additional Professional Services may be available for separate purchase to cover certain day-to-day system operational maintenance.

8.9   *Backups.* Customer acknowledges and agrees that by using Customer supplied System back-up hardware and/or software that it waives all maintenance support from IGT associated with recovery of the EZ Pay Server due to the failure of Customers in-house server or network hardware to perform daily backups.

9.   **Database Dictionary.**

9.1.   *License.* Subject to the terms and conditions herein, IGT grants to Customer a nonexclusive, non-transferable, royalty-free license to the Database Dictionary for internal use by Customer to access its data via a replicated database and to facilitate Customer's understanding of data in the System databases ("Purpose"). Except for the Purpose, Customer agrees not to use the Database Dictionary for any other reason or in any other manner whatsoever, including but not limited to development of independent applications of the Database Dictionary. Customer specifically agrees that any uses of the Database Dictionary other than the Purpose shall require a separate license agreement which may involve a licensing fee.

9.2.   *Interaction with System.* Customer is solely responsible for ensuring that any use of the Database Dictionary hereunder shall not adversely impact upon the functionality of the System. The repair of any damage or defect to a System caused by Customer's use of the Database Dictionary hereunder shall be specifically excluded from Maintenance Services; and Customer acknowledges and agrees that any such repairs may be subject to additional charges at the then prevailing rate for time and materials plus reimbursement for out of pocket expenses, which may include per diem charges. The cost of investigating the source of such damage or defect shall be borne by Customer. Customer acknowledges that the System versions periodically change through the issuance of Updates and Upgrades which may result in a modification of the Database Dictionary. Customer shall be solely responsible for requesting an update of the Database Dictionary. Customer is advised that a failure to request and review an updated Database Dictionary may result in an adverse affect to their use of the Database Dictionary and/or the System. Customer shall be solely responsible for the interoperability of any products or applications developed hereunder and updating any such products or application appropriately when System modifications are issued.

9.3.   *Restrictions on Use.* Database Dictionary shall not be used to create scripts, stored procedures, or any other programs that directly access or alter data in the live, production database. Access to the data shall be limited to accessing data stored in a replicated database. Customer acknowledges that any changes to a live, production database may require submission and approval by the responsible Gaming Regulatory Agencies; this includes, any changes to database structure or stored procedures of the data itself outside of what data can be changed using an IGT approved Advantage application. Regulatory submissions related to any such changes are the sole responsibility of the Customer.

10. **Acknowledgements.**

    10.1. The regulatory approval status of the versions of Licensed Software in the jurisdiction in which the Location operates has been provided to Customer. Some versions of Licensed Software may require regulatory approval prior to installation. Modifications to the Licensed Software will in almost all cases require re-submittal and re-approval of the Licensed Software by the regulatory agency.

    10.2. The non-delivery of a particular component of Licensed Software component due to the failure to obtain regulatory approval shall not constitute a breach of this Agreement. In the event that regulatory approval cannot be obtained for a particular Licensed Software component, Customer, as its sole and exclusive remedy, shall have the option to cancel its purchase of a license for that particular Licensed Software component and receive a refund of any prepaid License Fees for such component.

    10.3. IGT cannot guaranty specific delivery dates, Live Dates or Component Dates.

    10.4. Customer has no right to offset amounts due under this Agreement or any other agreement with IGT as a result of any claim by Customer related to this Agreement, including IGT's performance under this Agreement. By way of example, Customer may not withhold payments from IGT for other IGT products not contemplated in this Agreement.

    10.5. IGT's pre-installation procedures include an operational review wherein IGT will review with Customer its existing business practices as they relate to the functionality provided by a System. The operational review may not cover all possible aspects of functionality. As such, Customer is responsible for ascertaining and determining what aspects of functionality should be explained. Customer further acknowledges that prior business practices may need to be modified in order to conform to the operation of the System.

    10.6. *Non-Standard Infrastructure.* IGT tests, certifies, sells, licenses and supports specific configurations of hardware and software infrastructure as a standard solution. If Customer chooses a non-standard implementation of the infrastructure required for the System, Customer shall assume the overall System integration role and acknowledges its responsibilities for testing and maintaining the non-standard implementation. IGT has provided a list of essential infrastructure requirements necessary for the Products to function properly. The fulfillment of these requirements does not guarantee interoperability or performance, and the Customer is responsible for the testing thereof as part of their System integration role. Provided that the Customer has taken reasonable steps to ensure their non-standard implementation is tested before going into production, as well as being managed and maintained thereafter, IGT will support the Licensed Software operating on such non-standard implementation in accordance with the maintenance provisions of this Agreement. However, should joint troubleshooting efforts uncover any problems attributable to the non-standard implementation, IGT shall not be obligated to modify its Products to resolve the problem.

11. **Limitation of Liability.**

    11.1. In no event shall IGT or its licensors be liable for any indirect, special, general, incidental, punitive, exemplary or consequential damages, including loss of profits, interruption of business, loss of business revenue, other commercial or economic loss of any kind whatsoever, or any liability of customer to a third party, whether based on contract, tort or any other legal theory, even if IGT was advised of the possibility of such damages.

    11.2. In no event shall IGT's or its licensors' total liability under this Agreement exceed an amount equal to three (3) months of License Fees and Maintenance Fees for a Location paid by Customer to IGT.

    11.3. Notwithstanding anything else in this Agreement, IGT shall not be liable for (i) misuse, abuse, accidental damage, improper handling, or improper maintenance by anyone other than IGT technicians or others acting under IGT's direct control, or any cause other than ordinary use; (ii) damages to the operating system or data files due to causes external to the equipment, including power surges, power reductions or failure, defective electrical work, fire, flood, water, wind, lightning or any other natural phenomena; (iii) failure of Customer supplied hardware, software, communication lines, utilities or equipment; (iv) operator inefficiency or error or (v) any problem, error or malfunction attributable to the software or hardware of Customer or a third party.

    11.4. The provisions contained herein limiting IGT's liability constitute an essential part of the bargain underlying this Agreement and have been reflected in the purchase price and other consideration agreed upon by the Parties.

## 12. Indemnification

12.1.  *Indemnification by IGT.*  Subject to the terms and conditions of this Section 12, IGT will (a) defend at its expense any filed lawsuit (a "Claim") brought against Customer by a third party (the "Claimant") to the extent such Claim alleges that the Product provided by IGT to Customer under this Agreement violates or infringes the Claimant's patents, trademarks or copyrights or misappropriates the Claimant's trade secrets (collectively, "IP Rights"), and (b) either (i) indemnify Customer with respect to any final, non-appealable judgments, costs, fines or penalties awarded, entered or assessed against Customer by a court of competent jurisdiction that directly result from a Claim, or (ii) pay the value of any settlement with the Claimant agreed to by IGT.

12.2.  *IGT Options.*  If a temporary or permanent injunction is obtained against the use of any part of the Product for the reason that it infringes any third party's intellectual property rights  or there is a reasonable likelihood of such an injunction, IGT may at its option (a) modify the Product to avoid the allegation of infringement, (b) obtain for Customer the right to continue using the Product, or (c) replace the allegedly infringing Product with non-infringing Product that is functionally equivalent to the Product.  In the event that none of the foregoing is commercially reasonable, IGT may terminate Customer's right to use the allegedly infringing portion of the Product and, in such event, refund to Customer applicable prepaid and unearned fees amortized over five (5) years using straight-line amortization.

12.3.  *Exclusions.*  IGT will not be liable or have any obligations hereunder for any infringement of IP Rights resulting from (a) the combination, utilization or integration of the Product with Customer's or any third party's products or Product, (b) compliance with Customer's designs, specifications or instructions; (c) unauthorized modification of the Product by any entity other than IGT, or (d) use of the Product other than as specified in IGT's published specifications and documentation.  In the event a claim is made against IGT arising from the circumstances described in subsections (a) through (d) above, Customer will defend and indemnify IGT against such claim and damages and expenses related thereto at its sole expense.

12.4.  *Indemnified Party Obligations.*  To receive the foregoing defense and indemnities under this Section 12, the party seeking defense and indemnification must (a) notify the other party in writing of a Claim promptly after learning of the Claim, (b) tender sole control of the investigation, defense and/or settlement of the Claim to the indemnifying party, (c) provide reasonable cooperation in the investigation, defense and/or settlement of the Claim, and (d) make no admission of guilt or liability with respect to the Claim.  The indemnified party may, at its sole expense, actively participate in any suit or proceeding, through its own counsel.

12.5.  *Sole Obligation.*  The obligations of IGT set forth above in Section 12.1 are the sole obligations and exclusive liability of IGT to Customer, and Customer's sole recourse and remedy against IGT, for any claim or allegation of violation, infringement or misappropriation of an IP Right by the Product.

12.6.  *Limit on Liability.*  In no event shall IGT's liability for Claims under Section 12 exceed the amounts paid by Customer for the Product that is the subject of the Claim.

## 13. Confidentiality.
Any data or information disclosed to fulfill the purpose of this Agreement that is not made available by the disclosing Party to the general public shall be treated as confidential and proprietary information ("Confidential Information"). Confidential Information of IGT shall include IGT products offered for demonstration to Customer. Confidential Information shall be protected by a receiving Party from disclosure to third parties.  The foregoing obligation shall not apply to information which is (i) in the public domain or becomes part of the public domain through no fault of the receiving Party; (ii) known to the receiving Party prior to the time of disclosure and was not acquired, directly or indirectly, from the disclosing Party or (iii) was independently developed without knowledge or use of the Confidential Information.  A Party may disclose Confidential Information if required by applicable law or regulation or pursuant to a valid subpoena or court order, or by a request by a governmental or regulatory body provided that it gives reasonable notice, when legally permissible to the other Party to contest such disclosure.  Any such disclosure of Confidential Information shall not be deemed to change, affect or diminish the confidential and proprietary status of such Confidential Information. Each Party will employ at least the same degree of care used to protect their own most important confidential information (but in no event less than a reasonable standard of care). Each Party shall inform each of its employees and representatives to whom it provides access to another Party's Confidential Information of the obligations of confidentiality and will take all reasonable steps to ensure that the terms of this provision are not violated by any of its employees or agents. A Party is responsible for breach of this obligation by its employees or representatives.

14. **Term; Termination and Default**

14.1. *Term.* Term means the Initial Term and each Renewal Term. Initial Term means period commencing upon the last date of execution of this Agreement and continuing for three (3) years following the first Live Date ("**Initial Term**"). Renewal Term means each one (1) year period thereafter for which this Agreement is renewed pursuant to this Section 14 ("**Renewal Term**"). After the Initial Term, the Term of this Agreement shall automatically renew for each Renewal Term unless either Party provides thirty (30) days prior written notice of non-renewal; provided that in the event of a notice of non-renewal the Term shall expire at the later of expiration of the Term, Maintenance Term or License Term.

14.2. *Termination by Customer.* Customer shall have the ability to terminate this Agreement and its obligations hereunder upon the occurrence of an Event of Default (defined below) by IGT. In the event of such termination by Customer, Customer shall be entitled to a refund of any unused prepaid fees.

14.3. *Termination by IGT.* IGT shall have the ability to terminate this Agreement and its obligations hereunder upon the occurrence of any of the following: (i) an Event of Default (defined below) by Customer; (ii) a breach by Customer of Section 5.2.1 or Section 5.2.3 of this Agreement; or (ii) Customer terminates its business. In the event of Termination in accordance with this section 14.3, IGT shall be entitled to the License Fees due through the date of the expiration of the Term that was established prior to this early termination. Upon such termination by IGT the licenses granted hereunder shall terminate. The remedies in this Section 14.3 shall be in addition to and not in lieu of any remedies at law or in equity available to IGT.

14.4. *Event of Default.* It shall be an event of default hereunder ("Event of Default") if:

14.4.1. Either Party breaches any material term of this Agreement and such breach is not cured within thirty (30) days of written notice to the other Party or Customer breaches any of the terms of the licenses granted hereunder and such breach is not cured within the allotted time, if any; or

14.4.2. Either Party becomes insolvent or makes a general assignment for the benefit of creditors or becomes subject to any proceeding seeking to adjudicate it as bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official and such proceeding or order is not vacated within thirty (30) days after it is sought.

15. **General Provisions.**

15.1. *Return of IGT Property.* All Licensed Software, Hardware, parts or other materials or documents which are leased or licensed by IGT to Customer shall be returned by Customer to IGT upon termination of the Agreement, lease or license, as applicable.

15.2. *Force Majeure.* No delay or default in performance of any obligation by either party, shall constitute a breach of this Agreement to the extent caused by force majeure, including fires, strikes, riots, acts of God and government interference or control. Force Majeure under this Agreement does not include the inability of a party to make payment due to a lack of sufficient funds.

15.3. *Attorneys' Fees.* If either Party brings any legal action or other proceeding for breach of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs.

15.4. *Divisibility.* If any provision of this Agreement is held to be invalid or unenforceable, in whole or in part, by a court or regulatory agency of competent jurisdiction such provision shall be ineffective to the extent of the prohibition or unenforceability without invalidating or adversely affecting any other provision.

15.5. *Entire Agreement.* This Agreement, including the documents incorporated by reference herein constitutes the entire agreement between the Parties relating to the subject matter hereof and supersedes all prior or contemporaneous negotiations or agreements, whether oral or written, relating to the subject matter hereof. No extension, modification or amendment of this Agreement shall be binding upon a Party unless set forth in a written instrument, which is executed and delivered on behalf of such Party. The Parties agree that no provision or term in a Customer's purchase order or other form or document submitted by Customer shall add to or modify the terms contained in this Agreement.

15.6.  *Governing law.*  This Agreement shall in all respects be governed by and construed in accordance with the laws of Singapore. Any dispute arising out of or in connection with this agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The Tribunal shall consist of three arbitrators. The language of the arbitration shall be English.

15.7.  *Limitation on Services.*  Integration services are not included in this Agreement. In the event that Customer requests that all or part of the Products be tested by an independent testing laboratory for interoperability with third party products Customer shall be solely responsible for the costs of such laboratory. In addition, Customer shall be solely responsible for IGT's costs of time and material.

15.8.  *Regulatory Compliance.*  As businesses involved in the gaming industry, IGT, Customer, and their affiliates conduct business in a highly regulated industry under privileged licenses issued by gaming regulatory authorities both domestic and international.  Both Parties maintain compliance programs that have been established to protect and preserve the name, reputation, integrity, and good will of IGT, Customer, and their affiliates and to monitor compliance with the requirements established by gaming regulatory authorities in various jurisdictions around the world.  Performance of this Agreement is contingent upon both Parties' compliance with the laws, regulations, and policies in jurisdictions where business activity is conducted. Failure to comply with the laws, regulations, and policies in jurisdictions where business is conducted could result in termination of the Agreement.  Both Parties agree to cooperate with requests, inquiries, or investigations of gaming regulatory authorities or law enforcement agencies in connection with the performance of this Agreement.  If either Party determines that continuation of this Agreement would jeopardize the gaming licenses, permits or status of that Party with any gaming regulatory authority or similar law enforcement authority, then the Agreement may be immediately terminated and neither Party shall have any additional rights hereunder, except for those liabilities or debts incurred prior to termination.  Customer and IGT specifically agree that each shall scrupulously observe all applicable federal, state, tribal and local laws relating to the activities contemplated by this Agreement.

15.8.  *FCPA Representations and Warranties.*  Both parties represent, warrant and covenant to each other that (a) it shall conduct its business in compliance with applicable laws, including without limitation the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 et seq., the United Kingdom Bribery Act 2010 and all other applicable laws relating to anti-corruption, anti-bribery, anti-money laundering and sanctions including without limitation applicable anti-corruption laws of Singapore and the Commonwealth of the Northern Mariana Islands, (b) it (including its officers, directors, employees, shareholders, agents and any other third parties acting on its behalf) will not directly or indirectly through any third party or person pay, offer, promise or authorize payment of any monies or anything of value to any official for the purpose of improperly inducing, influencing or rewarding favorable treatment or advantage in connection with this Agreement or with one party's relationship with the other, and (c) it shall promptly notify the other party in the event of any actual or alleged breach or violation of any such laws. If at any time a party ("Aggrieved Party") reasonably believes that the other party ("Offending Party"), or any of its officers, directors, employees, shareholders, agents and any other third parties acting on its behalf is in violation of the provisions of this section, the Aggrieved Party will provide written notice to the Offending Party of such belief and will provide the Offending Party with a period of ten (10) business days from receipt of the notice to respond with an explanation as to why it does not consider itself, or any of its officers, directors, employees, shareholders, agents or any other third parties acting on its behalf to be in violation of the provisions of this section. The Aggrieved Party may immediately terminate this Agreement and be released and fully discharged from all its obligations under this Agreement if the Offending Party fails to respond or has not provided a reasonable explanation as to why there has been no violation.  In such an event, Offending Party will waive any claims it may have against the Aggrieved Party and its parent, affiliates, subsidiaries, and related companies, and the officers, directors and employees of each, for any damages, losses, fees or costs (including attorney's fees) incurred by them as a result of such actual or alleged violation. For the purposes of this section, the term **"official"** includes but is not limited to (a) an executive, official, employee or agent of a governmental authority or any other governmental department, agency or instrumentality, (b) a director, officer, employee or agent of a wholly or partially government-owned or controlled company or business, (c) a political party or official thereof, or candidate for political office or (d) an executive, official, employee or agent of a public international organization.

15.9.   *Counterparts/facsimile.*  The Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute a single Agreement. Each Party may rely upon the facsimile signature of the other.

15.10.  *Assignment.*  This Agreement will bind and inure to the benefit of each Party's permitted successors and assigns. Customer shall not assign this Agreement without IGT's prior written consent, which shall not be unreasonably withheld. Any attempt to assign this Agreement without such consent will be null and void.

15.11.  *Notices*

15.11.1.   FORM AND RECEIPT OF NOTICE.  A notice, consent or other communication under this agreement is only effective if it is in writing, signed and either left at the addressee's address or sent to the addressee by post, fax or e-mail. If it is sent by post, it is taken to have been received 3 Business Days after it is posted. If it is sent by fax, it is taken to have been received when the addressee actually receives it in full and in legible form. If sent by email, it is taken to have been received when the sender receives confirmation on its server that the message has been transmitted.

15.11.2.   ADDRESS FOR NOTICES.  A person's postal address, fax number and email address for the purpose of giving notices are those specified below or as the person subsequently notifies the sender in writing.

| If to Customer: | If to IGT |
|---|---|
| Imperial Pacific International (CNMI) LLC | IGT Asia Pte Ltd |
| trading as Best Sunshine International | 1 Changi North Street 1 |
| Chalan Pale Arnold Road, Garapan, Saipan | #02-01 Singapore 498789 |
| **With copy to:** | **With copy to:** |
| Imperial Pacific International (CNMI) LLC | Asia Pacific Regional Counsel |
| Suite 7001, Level 70, IFC Two | IGT (Australia) Pty Ltd |
| 8 Finance Street, Central | Level 5, Building B, 11 Talavera Road |
| Hong Kong | Macquarie Park NSW 2113, Australia |
| | Fax No +61 2 9812 2300 |

15.12.  *Independent Contractors.*  The Parties to this Agreement are independent contractors. There is no relationship of partnership, joint venture, employment, franchise, or agency between the Parties. Neither Party will have the power to bind the other or incur obligations on the other's behalf without the other's prior written consent.

15.13.  *Waiver.*  No failure of either Party to exercise or enforce any of its rights under this Agreement will act as a waiver of such rights.

15.14.  *Survival.*  The rights and obligations of the Parties contained in Sections 1 (Definitions), 2 (Interpretation), 4.5.5 (Interest), 5 (License Provisions; Intellectual Property Rights), 6 (Audit), 7.2 (Disclaimer), 11 (Limitation of Liability), 13 (Confidentiality); 15 (General Provisions) and accrued payment obligations will survive the termination of this Agreement.

15.15.  *No Third Party Beneficiaries.* This Agreement is solely for the benefit of IGT, Customer and Location and no other person or entity shall have any rights hereunder.

The parties hereto have duly executed this Agreement as of the date last written below.

IGT                                                                Customer

By: _____                      By: _____

Name: _____**Mark Michalko**_____                    Name: __Kwong  Yiu  Ling__

Title: _____ Sales Director Asia _____          Title: _Chief Operating Officer_

Date: _____ 18 Nov 2016 _____          Date: _24 - Oct - 2016_

# ADVANTAGE® sbX® AND EZ PAY® SCHEDULE

1. __Additional Definitions.__ The following definitions are deemed added to the Systems General Terms and Conditions Agreement ("GTC Agreement"). Unless specifically defined herein, capitalized terms shall have the same meaning as defined in the GTC Agreement.

   1.1. *Advantage System.* Advantage System means the casino management system marketed by IGT under the name IGT Advantage System.

   1.2. *EZ Pay System.* EZ Pay System means the gaming device tracking and promotion system known generically as the IGT Ticket In – Ticket Out EZ Pay System.

   1.3. *Game Hardware Kit.* Game Hardware Kit means the components installed in a Gaming Device necessary to utilize the functionality of the Licensed Software.

   1.4. *Graphic Content Services.* Graphic Content Services means the services to produce the Media Manager Skins.

   1.5. *Graphic Content Services for Advantage with UGA.* Graphic Content Services for Advantage with UGA means the services to produce the file formats required for content creation to be displayed on Gaming Devices that utilize a UGA.

   1.6. *IGT Machine.* IGT Machine means a Gaming Device offered by IGT on a "for sale" basis, as a capital lease or as an operating lease.

   1.7. *Maintenance Term.* Maintenance Term means the three (3) year period following the expiration of the warranty, if any, or the Live Date of the applicable Licensed Software for the particular Location. Following the initial Maintenance Term, the Maintenance Term shall automatically renew on a monthly basis unless either Party provides thirty (30) days prior written notice of non-renewal.

   1.8. *Media Manager.* Media Manager means the software module marketed by IGT as Media Manager for the deployment of content and applications to the service window or other media displays.

   1.9. *MegaJackpots Machine.* MegaJackpots Machine means an IGT Gaming Device placed on a recurring revenue basis and where title to the machine is retained by IGT, an IGT partner or an IGT affiliate.

   1.10. *NexGen Premium Graphics.* NexGen Premium Graphics means the graphics package to provide customized content for NexGen multi-media using casino logo and other available branding logos. Screens will be developed by IGT artists according to a branding scheme approved by Customer. This package includes screens relating to balances and functions of player points and PointPlay, complimentaries, XtraCredit and XtraCredit redemption. Ten idle and busy attracts are also included with limited flash animation. Background themes are customized in conjunction with the casino's branding scheme.

   1.11. *NexGen Unit.* NexGen Unit means certain components of a Game Hardware Kit that include some or all of the following items dependent upon the type of Gaming Device, communication protocols utilized by the Gaming Device and the floor network wiring: sb NexGen 2, NexGen firmware, Adobe Flash software, slot machine interface board, card reader, and Xport device; but specifically excludes the power supply, brackets and harnessing.

   1.12. *sbX Analytics.* sbX Analytics means the software application that analyses and produces reports based on the data gathered by sbX Floor Manager.

   1.13. *SbX Floor Manager.* sbX Floor Manager means the software application that facilitates the management of the sbX networked floor. It also enables the download and configuration of Game Themes on a Gaming Device.

   1.14. sbX System. sbX System means the server based system marketed by IGT under the name sbX and includes the sbX Floor Manager software component, sbX Analytics and may include other software components as set forth on Exhibit A.

   1.15. *SDK.* SDK means the Media Manager software development kit used to create customized software applications.

1.16. *System.* System means Advantage System, sbX System and EZ Pay System.

1.17. *Ticket Specification.* Ticket Specification means the format of the ticket printed by a Gaming Machine attached to the EZ Pay System as specified by IGT.

1.18. *UGA.* UGA means a hardware product marketed by IGT under the name Universal Game Adaptor which is primarily comprised of a slot machine interface board and related firmware that allows the Advantage System to communicate on the game screen of certain legacy IGT Machines and other manufacturers Gaming Devices.

2. <u>Location.</u> The Location is Imperial Pacific Resort, Saipan.

3. <u>IGT Responsibilities.</u> IGT shall be responsible for the items set forth in this Section 3.

3.1 IGT shall assemble the components Game Hardware Kits by mounting the components into the mounting brackets and pre-assembling the slot machine interface board, power supply and harnessing.

3.2 IGT shall install the Game Hardware Kits into the Gaming Devices.

3.3 IGT shall install the touch screen pit consoles on the mounting brackets attached to the Gaming Devices.

3.4 IGT will provide maintenance services for approved hardware interfaces and licensed software interfaces under the same terms and conditions as set forth in this Agreement. IGT may require cooperation from other vendors for successful completion and testing of the software interfaces; without cooperation IGT cannot warrant the successful operation of the interface.

3.5 At no additional charge to Customer, IGT will:

    (a) design a new sbX interface plugin to handle the pin validation when a player wants to use their Ecash balance at Location as part of Customer's CMS system;
    (b) update/enhance the existing player tracking interface to incorporate the use of the BE2 date and time, and will also include the addition of the CardIN Count to the CardIN message;
    (c) implement full insertion card reader. IGT to update card reader firmware/NGx software to manipulate the 36 digit card encoding and only send customer ID and validation code. IGT will also support the smaller Fidelio card number.

3.6 The software developed under clause 3.5 forms part of the System for the purposes of this Agreement and is developed by IGT at its absolute discretion and based on IGT's standard specifications and "as is".

4. <u>Customer Responsibilities.</u> Customer shall be responsible for the items set forth in this Section 4.

4.1 Customer shall supply the backoffice computer hardware, meeting the specifications outlined on Exhibit B attached hereto and made a part hereof.

4.2 Customer shall supply the peripheral workstations and equipment required for operation of the System. All peripheral workstations and equipment shall be on IGT's list of approved equipment. Examples of such peripheral workstations and equipment are listed on Exhibit C attached hereto and made a part hereof.

4.3 Customer shall run system technical performance reports enabled by the System that are reasonably requested by IGT. Reports shall be run and submitted to IGT monthly.

4.4 Customer shall install the mounting brackets for the touch screen pit consoles on the Gaming Devices.

4.5 Customer shall pay the hook up fee(s) (Field Services) set forth in Exhibit A. Customer acknowledges and agrees that (i) the hook up fee is based upon the quantity of Gaming Devices communicating with the EZ Pay System; (ii) in the event that Customer increases the number of Gaming Devices communicating with the EZ Pay System, additional hook up fees will be due and payable pursuant to the terms and conditions of the IGT Sales Order; and (iii) there shall be no refund or credit for any reduction in the number of Gaming Devices communicating with the EZ Pay System.

4.6   Customer is responsible for ensuring Ticket Specification is maintained per IGT requirements for each Gaming Device connected to the EZ Pay System.

4.7   Customer acknowledges and agrees that except for IGT's obligations and warranties under this Agreement, it has responsibility for the day-to-day operation of the System, and that its designated support representatives will handle routine questions and ongoing training. In the event IGT concludes that Customer is not meeting this obligation, IGT will notify Customer in writing and give thirty (30) days' notice that support will be charged at the prevailing hourly rate until Customer's representatives are trained and qualified in the usage and maintenance of the System and any associated equipment.

5.   <u>License Term</u>. Subject to the terms herein, IGT is providing an Advantage System, sbX System and EZ Pay System to Customer. Customer agrees to license the Licensed Software that is subject to a Subscription License for the duration of the License Term in the quantities and amounts identified on Exhibit A.

6.   <u>Gaming Device Prerequisites.</u>

6.1.   Customer shall ensure that all Gaming Devices connected to the System are compliant with the protocol requirements of the System which currently are either (i) compliant with G2S communication protocol standards or (ii) compliant with SAS 5.10 or greater communication protocol that supports the advanced funds transfer mechanism combined with utilizing a slot machine interface board that translates required SAS commands to G2S commands.

6.2.   Customer acknowledges that IGT Gaming Devices fitted with AVP 2.0 electronics are not compliant with the sbX System.

6.3.   Customer acknowledges that IGT Gaming Devices fitted with AVP 2.5 electronics are not compliant with the Media Manager Licensed Software.

6.4   Licensed Software is designed to work with current versions of IGT's SAS protocol. Gaming Devices that do not conform to that standard are not included in the scope of this Agreement.

7.   <u>Media Manager with Graphic Content.</u>   If Customer has purchased Graphic Content Services the following provision shall apply. IGT grants to Customer a non-exclusive perpetual and non-transferable license to use, reproduce, modify, internally distribute within the Locations, publicly perform and publicly display the "Skin" for purposes of producing content solely for use in the Locations.  The term "Skin" means a FLA source file that is published into an Adobe flash format ending in "SWF", and imported into the library inside the Media Manager application ("Media Manager Library"). Such FLA source file includes all content and Flash Action Scripting™ that is used to create the "SWF" file, which is the file format used for importing content into the Media Manager Library. Any source file with Flash Action Scripting™ other than the graphical content "Skins", such as the plug in, are not "Skins" for the purposes noted in Additional Definitions 1.3 and 1.8. Customers and Locations acknowledge that IGT has developed certain hardware, software and service ("Developed Systems") which may be covered by intellectual property rights and that nothing in this Schedule is intended to alter the ownership of such Developed Systems or to grant Customer or Locations any rights therein other than the grant of rights specifically set forth above.  For avoidance of doubt, the Adobe Flash formats ending with "SWF" are owned by the Customer, while the IGT Skin and related source code provided in Adobe Flash formats ending in "FLA", in connection with the non- transferable license granted, is owned by IGT.  Customer may provide third parties the FLA files for the limited purposes described above provided they are held to the same duties as the Customer.  After release to the Customer of the FLA and/or any related file(s), IGT assumes no responsibility or liability for any changes made by Customer or third party on behalf of Customer.  Unless performed by IGT and covered under separate agreement, IGT is not responsible for any modifications required on any released source file(s), including but not limited to modifications required as a result of a system or hardware upgrade, modification, or enhancement. The parties agree and acknowledge any Skin provided pursuant to this Schedule are not Licensed Software as that term is defined in this Agreement, and that no maintenance services are provided for or in connection with such Skin.

8.   <u>Advantage with Graphic Content.</u>  If Customer has purchased Graphic Content Services for Advantage with UGA the following provision shall apply.  IGT grants to Customer a non-exclusive perpetual and non-transferable license to use, reproduce, modify, internally distribute within the Locations, publicly perform and publicly display the "Gif" and/or "skin" for purposes of producing content solely for use in the Locations.  The term "Skin" means a FLA source file that is published into an Adobe flash format ending in "SWF", and downloaded to the sbNexGen/NexGen display device.  Such FLA source file includes all content and Flash Action Scripting™ that is used to create the "SWF" file. Customer acknowledges that IGT has developed certain hardware, software and service ("Developed Systems") which may be

covered by intellectual property rights and that nothing in this Schedule is intended to alter the ownership of such Developed Systems or to grant Customer or Locations any rights therein other than the grant of rights specifically set forth above. For avoidance of doubt, the Adobe Flash formats ending with "SWF" are owned by the Customer, while the IGT Skin and related source code provided in Adobe Flash formats ending in "FLA", in connection with the non-transferable license granted, is owned by IGT. Customer may provide third parties the FLA files for the limited purposes described above provided they are held to the same duties as the Customer. After release to the Customer of the FLA and/or any related file(s), IGT assumes no responsibility or liability for any changes made by Customer or third party on behalf of Customer. Unless performed by IGT and covered under separate agreement, IGT is not responsible for any modifications required on any released source file(s), including but not limited to modifications required as a result of a system or hardware upgrade, modification, or enhancement. The parties agree and acknowledge any Skin provided pursuant to this Schedule are not Licensed Software as that term is defined in this Agreement, and that no maintenance services are provided for or in connection with such Skin.

9. SDK. Subject to the restrictions contained in Section 5.2 of the GTC Agreement, IGT grants to Customer a limited non-exclusive and non-transferable license, without right to sublicense to use the SDK for the purpose of creating applications for use in the service window at Locations. Applications created using the SDK may only be used by Customer at Location and may not be sold or otherwise distributed to any third party.

10. UGA.

10.1. Customer acknowledges that the UGA may not be compatible with certain of the Customer's Gaming Devices. In the event the UGA is not compatible or is otherwise not available for whatever reason, Customer shall purchase pursuant to an IGT Sales Order, the NexGen Units, power supplies, brackets and harnessing in order to connect those incompatible Gaming Devices and/or non-IGT Gaming Devices to the Advantage System. Firmware Maintenance Fees on the NexGen Units shall be at the same price as the UGA firmware Maintenance Fees.

10.2. Customer is solely responsible for installation of the UGA on Gaming Devices other than IGT Machines and for securing any required consents from such third party manufacturers.

10.3. If so indicated on Exhibit A, IGT shall be responsible for installing the UGA on IGT Machines for the fee set forth on Exhibit A.

10.4. Customer shall not install a UGA on a Gaming Device that is not owned by Customer without the owner's consent.

10.5 Customer is solely responsible for the content enabled or displayed by the UGA.

10.6 Customer acknowledges that changes to Gaming Device communication protocols may affect the operability of the UGA. During the Maintenance Term, IGT will use commercially reasonable efforts to address such issues. However, Customer has primary responsibility for ensuring that non-IGT Gaming Devices have and maintain compatible communication protocols which includes securing cooperation of third party manufacturers.

11. Fees. The fees and charges applicable to the Advantage System, sbX System and EZ Pay System are detailed on Exhibit A. Maintenance Fees for Licensed Software licensed on a subscription basis are included in Subscription License fees. Maintenance Fees for other Licensed Software are detailed on Exhibit A or set forth in an IGT Sales Order. Maintenance Fees for third party software are not optional and must be paid for so long as the Customer utilizes the third party Product.

12. Maintenance. Customer has elected to purchase Licensed Software maintenance services for the Maintenance Term for Location. Maintenance Fees as set forth in Exhibit A.

13. Additional Professional Services. IGT shall provide the below described professional services as described and for the fees as set forth in Exhibit A and subject to the maximum number of hours set forth below.

13.1. Service Window Standard Content Flash Based. IGT shall provide (i) guidance in the development of an integrated and branded communication strategy for the service window; (ii) design and deliver service window screens relating to balances and self-service functions of player points, complimentaries, gift points, and slot attendant carded sessions. Also included are custom content property sections (e.g. dining, entertainment, promotions, retail) that are accessible by the player in both carded and uncarded sessions at the Gaming Devices as well as attract/idle based content support for Media Manager Gaming Devices.   This package includes sbNexGenIIx, game to system and/or UGA IGT service window sizes. IGT shall provide resizing of base service window content per non-IGT manufacturer for up to three sizes. IGT shall provide the advanced Media Manager content development package and will train site staff to handle

content changes to the service window or other media displays that communicate with Media Manager, such as the digital top glass of an AVP. Maximum number of hours is 200.

13.2 B o n u s Implementation Services. IGT will assist Customer in developing a strategy for implementation. Services will include a project plan for the development and delivery of Bonuses. For Bonus Implementation Services for Xtra credit and point play referred to in Exhibit A, the maximum number of hours is 30 hours each. For Bonus Implementation Services for CLC, SRP, Carded Lucky Time and Celebration Prizes, the maximum number of hours is 60 hours each.

14. Pre-installation. Exhibit D which sets forth the pre-installation check list and wiring specifications is attached hereto and made a part hereof.

15. Unapproved Products. Customer acknowledges that the Advantage System, sbX System and EZ Pay System are not currently approved for installation at the Customer Location listed (if such approval is required). Although IGT will use commercially reasonable efforts to obtain regulatory approval, IGT cannot control or compel regulatory approval of Products and as such makes no representation or warranty, express or implied, with respect to the ability to obtain regulatory approval of any particular version, components or modifications of Products.

# EXHIBIT A

## Advantage, sbX and EZ Pay System Pricing (in US dollars)

| Qty | Description | List Price | Extended Price | Discount % | Discount $ | Total Price | Annual Software & Maintenance Fees |
|---|---|---|---|---|---|---|---|
| | **Application Software** | | | | | | |
| 355 | Machine Accounting Licenses | $ 375 $ | 63,975 | 40% | $ (25,590) $ | 38,325 $ | 12,775 |
| 365 | Advantage Monitor Licenses | $ 65 $ | 23,725 | 40% | $ (9,490) $ | 14,235 $ | 4,745 |
| 365 | Patron Management Licenses | $ 225 $ | 82,125 | 40% | $ (32,850) $ | 49,275 $ | 16,425 |
| | **Total Application Software** | $ | 169,725 | 40% | $ (67,890) $ | 101,835 $ | 33,945 |
| | | | | | | | |
| | **Mobile CMS** | | | | | | |
| 1 | Mobile Host * | $ 25,000 % | 25,000 | 100% | $ (25,000) $ | $ | 2,500 |
| | **Total Mobile Software** | $ 25,000 $ | 25,000 | 100% | $ (25,000) $ | $ | 2,500 |
| | | | | | | | |
| | **Specialty Software Licenses** | | | | | | |
| 3 | Cashier Terminal Network Interface License | $ 4,500 $ | 13,500 | 40% | $ (5,400) $ | 8,100 $ | 2,700 |
| 1 | Advanced Marketing Interface (AMI) Site License | $ 45,000 $ | 45,000 | 40% | $ (18,000) $ | 27,000 $ | 9,000 |
| 230 | Cage And Table Accounting Connection Licenses*** | $ 2,500 $ | 125,000 | 40% | $ (50,000) $ | 75,000 $ | 25,000 |
| 230 | Credit And Collection Connection Licenses*** | $ 2,100 $ | 105,000 | 40% | $ (42,000) $ | 63,000 $ | 21,000 |
| 1 | Rebates and Commissions | $ 100,000 $ | 100,000 | 40% | $ (40,000) $ | 60,000 $ | 20,000 |
| | **Total Specialty Software** | $ | 388,500 | 40% | $ (155,400) $ | 233,100 $ | 77,700 |
| | | | | | | | |
| | **Cashless Gaming Software** | | | | | | |
| 365 | TITO Connection Licenses | $ 325 $ | 118,625 | 40% | $ (47,450) $ | 71,175 $ | 23,725 |
| | **Total Cashless Gaming Software** | $ | 118,625 | 40% | $ (47,450) $ | 71,175 $ | 23,725 |
| | | | | | | | |
| | **Table Manager Software** | | | | | | |
| 230 | Player Ratings, Fills/Credits, Headcount, Event Monitor Licenses | $ 3,475 $ | 729,750 | 40% | $ (291,900) $ | 437,850 $ | 173,000 |
| | **Total Table Manager** | $ | 729,750 | 40% | $ (291,900) $ | 437,850 $ | 173,000 |
| | | | | | | | |
| | **Bonusing Software** | | | | | | |
| 365 | FastPlay* Connection Licenses | $ 225 $ | 82,125 | 40% | $ (32,850) $ | 49,275 $ | 8,213 |
| 365 | Xtra Credit* Connection Licenses | $ 225 $ | 82,125 | 40% | $ (32,850) $ | 49,275 $ | 8,213 |
| | **Total Bonusing Software** | $ | 164,250 | 40% | $ (65,700) $ | 98,550 $ | 16,425 |
| | | | | | | | |
| | **sbX®** | | | | | | |
| 365 | Media Manager Connection License | $ 175 $ | 63,875 | 40% | $ (25,550) $ | 38,325 $ | 12,775 |
| | **Total sbX** | $ | 63,875 | 40% | $ (25,550) $ | 38,325 $ | 12,775 |
| | | | | | | | |
| | **Display Kits** | | | | | | |
| 14 | AVP Card Reader (with bracket) ** | $ 440 $ | 6,160 | 35% | $ (2,156) $ | 4,004 $ | . |
| 245 | USA for 925 New Installation ** | $ 2,495 $ | 711,075 | 35% | $ (248,876) $ | 462,199 $ | 2,050 |



| Qty | Description | List Price | | Extended Price | Discount % | | Discount $ | | Total Price | | Annual Software & Maintenance Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 106 | Secondary Display Kit - G2S Floor New Installations | $ | 2,495 | $  264,470 | 35% | $ | (92,565) | $ | 171,906 | $ | 2,968 |
| | **Total Displays** | | | $  981,705 | 35% | $ | (343,597) | | 638,108 | $ | 10,949 |
| | | | | | | | | | | | |
| | **Hardware/Parts** | | | | | | | | | | |
| 2 | Neuron Card Encoder | $ | 1,662 | $  3,324 | 40% | $ | (1,330) | $ | 1,994 | $ | - |
| | **Total Hardware/Parts** | | | $  3,324 | 40% | $ | (1,330) | | 1,994 | $ | |
| | | | | | | | | | | | |
| | **Consulting Services** | | | | | | | | | | |
| 1 | Graphic Content Services - Service Window Baseline Content (Flash Based) (200 hours maxim | $ | 50,000 | $  50,000 | 60% | $ | (30,000) | $ | 20,000 | $ | |
| | **Total Consulting Services** | | | $  50,000 | 60% | $ | (30,000) | | 20,000 | | |
| | | | | | | | | | | | |
| | **Project Management, Installation & Customer Training** | | | | | | | | | | |
| 1 | Advantage Application Ops | $ | 133,000 | $  133,000 | 60% | $ | (79,800) | $ | 53,200 | $ | - |
| 1 | Advantage Project Management | $ | 78,575 | $  78,575 | 60% | $ | (47,145) | $ | 31,430 | $ | - |
| 1 | Advantage Technical Services | $ | 158,000 | $  158,000 | 60% | $ | (94,800) | $ | 63,200 | $ | - |
| 1 | Advantage Field Services (Go-Live Support) | $ | 3,600 | $  3,600 | 60% | $ | (2,160) | $ | 1,440 | $ | - |
| 1 | Table Manager - Application Ops | $ | 17,300 | $  17,300 | 60% | $ | (10,380) | $ | 6,920 | $ | - |
| 1 | Table Manager - Project Management | $ | 16,320 | $  16,320 | 60% | $ | (9,792) | $ | 6,528 | $ | - |
| 1 | Table Manager - Technical Services | $ | 25,180 | $  25,180 | 60% | $ | (15,103) | $ | 10,072 | $ | - |
| 1 | Table Manager - Field Services (Go-Live Support) | $ | 60 | $  60 | 60% | $ | (36) | $ | 24 | $ | - |
| 1 | Mobile CMS - Application Ops * | $ | 5,600 | $  5,600 | 100% | $ | (5,600) | $ | - | $ | - |
| 1 | Mobile CMS - Project Management * | $ | 7,700 | $  7,700 | 100% | $ | (7,700) | $ | - | $ | - |
| 1 | Mobile CMS - Technical Services * | $ | 8,000 | $  8,000 | 100% | $ | (8,000) | $ | - | $ | - |
| 365 | Field Service EGM Install/Connectivity (Priced per EGM) | $ | 150 | $  54,750 | 60% | $ | (37,850) | $ | 21,500 | $ | - |
| | **Total Project Management, Installation & Customer Training** | | | $  508,085 | | $ | (313,371) | | 194,714 | $ | - |
| | **Total (excludes taxes, duties and freight expense)** | | | $  3,202,839 | 43% | $ | (1,367,187) | $ | 1,835,652 | $ | 351,018 |

| Qty | Description | Annual | | Annual Extended | Discount % | | Discount $ | | Total Price | | Annual Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Annual Subscriptions** | | | | | | | | | | |
| | **Bonus ( Subscription - per Year )** | | | | | | | | | | |
| 1 | Graphic Content Services - Content Services Package (80 hours maximum per year) | $ | 20,000 | $  20,000 | 40% | $ | (8,000.00) | $ | 12,000 | $ | 12,000 |
| | **Total Bonus Subscriptions ( Annual License Fees )** | | | $  20,000 | 40% | $ | (8,000) | | 12,000 | | 12,000 |
| | | | | | | | | | | | |
| | **Total Annual Subscriptions** | | | $  20,000 | 40% | $ | (8,000) | $ | 12,000 | $ | 12,000 |



Notes
- Purchase of a server is not included in the server configuration fee
- Above pricing excludes spare parts cache (recommended at 1-2% of the total floor
- Above pricing excludes any amounts payable to game manufacturers for licensing games to use cashless gaming patents
- Some machines may not work with UGA. Those machines require the Customer to purchase an sbNexGen2 at Customer's expense
- **Quoted number assumes 120 gaming machines which require AVP Card Readers instead of UGAs. The price will vary depending on the volume of IGT gaming machines purchased.
- ***Price cap per site.

**EXHIBIT B**
Saipan - Advantage and sbX Server Hardware Lists**

| Hardware Components | Purpose | QTY |
|---|---|---|
| Dell PowerEdge R610 | VMWare vSphere Servers | 4 |
| Dell PowerEdge R610 | VMWare vCenter Servers | 1 |
| Backup Media | Backup Solution | 1 |
| KVM Switch | KVM Switch | 1 |
| Ethernet Switches 1GbE | Switches | 3 |
| 1U KMM Rack Console | Keyboard, Mouse, and Monitor | 1 |
| Rack Power Distribution Unit 200/208V | Power Distribution Unit | 2 |
| Smart-UPS 6000VA RT 208V | Un-Interuptable Power Supplies (30 Mins) | 3 |
| 47U Server Rack Enclosure | Server Rack | 1 |
| | | |
| Antivirus Software | | |
| Endpoint Antivirus Protection | Endpoint Antivirus Protection | 1 |
| Backup solutions | Backup solutions | 1 |
| Endpoint Management | Endpoint Management | 1 |
| | | |
| Event Monitors Tool | | |
| Event Monitoring Tools | Event Management Software | 1 |
| | | |
| Storage Components | | |
| SAN Storage with Dual Controller 12x1.2TB SAS Disks | Storage Area Network Device | 1 |
| | | |
| System Components | | |
| Windows Server 2012 R2 Standard* | | 11 |
| SQL Server 2014 R2 Enterprise | | 3 |
| Windows 10 Pro | | 2 |

*The number of licenses required by virtualized servers is dependent on the licensing agreement between property and Microsoft.
** The above is a generic list of hardware and software components which IGT recommend; equivalent components can be sourced as long as the necessary hardware and software specifications are met.

# EXHIBIT C
## Saipan - Peripheral Equipment List

### Customer Hardware Necessary to Operate the System at Casino Location

| | Computer Workstation | Access to Workstation Dedicated Printer | Touch Screen with Magnetic Stripe Reader | Dedicated Receipt Printer | Barcode Reader | Dymo w/ labeling Station | Bar Code Label Printer | Pin Pad Keyboard | Card Dropper | Card Printer | Encoder | Paper | Transponder | Access to Home or Large Format Color Printer | Barcode Scanner | Card Swipe or Keyboard Card Swipe | Ticket/Bill Counter | Coin Scale |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Machine Accounting | | | | | | | | | | | | | | | | | | |
| Employee Sign-In Station | X | O | | R(2) | | X(2) | | x | | | | | | | | | | |
| Fills and Jackpot Station | X | R | O | X | | | | | | | | | | | | | | |
| Auxiliary Fills Station (Optional) | X | | O | X | | | | | | | | | | | | | | |
| Audit | X | R | | | | X | X | | | | | | | | | | | |
| Slot Department/Game Setup | X | R | | | | | | | | | | | | | | | | |
| Hardcount Room | X | R | | | | | | | | | | | | | | | | X |
| Softcount Room & Drop Team | X | R | | | | | X | | | | | | | | X(1) | | | |
| Ticket Redemption Station | X | | R | X | X | | | | | | | | | | | | | |
| Event Monitor | | | | | | | | | | | | | | | | | | |
| Security | X | R | | | | | | | | | | | | | | | | |
| Paging System (Optional) | X | | | | | | | | | | X | X | X | | | | | |
| Patron Management | | | | | | | | | | | | | | | | | | |
| Club Booth | X | R | | | | | | X(6) | | X | | | | | X | | | |
| Cage and Table Accounting | | | | | | | | | | | | | | | | | | |
| Cage Windows | X | | O | X | X | | | | | | | | | | | R | | |
| Table Fills/Credits Bank | X | | O | X | X | | | | | | | | | | | | | |
| Softcount Room & Drop Team | X | | | X | | | | | | | | | | | | | X | |
| Change Booths | X | | O | X | | | | X(3) | | | | | | | | R(3) | | |
| Table Manager | | | | | | | | | | | | | | | | | | |
| BOH Administrative | X | | | X | | | | | | | | | | | | | | |
| Pit Stand/Pit Section | X | | X | X | | | | | | | | | | | | | | |
| Administrative | | | | | | | | | | | | | | | | | | |
| Office Staff (*) | X | O | | | | | | | | | | | | R (5) | | | | |
| Redemption Station | X | X | O | X | X | | | | | | | | | | | X | | |

X= Required  O=Optional  R=Recommended

(*) For use by Accounting, Marketing, Surveillance and Operations

(1) At least one unit required

(2) Required if casino chooses to check-out and track radios , tools, or other barcode equipment

(3) required if Coinless transit™ cashouts are available in the change booths

(4) Required if issuing markers in Pit

(5) helpful for Visual Slot Performance maps

(6) Required if using pin protected features

Exhibit
D
Wiring Specifications for IGT Systems

This document details three major areas to be addressed each time a site requests an installation.

Communications Network Requirements and Responsibilities

Power Requirements and Responsibilities

_ Computer Room/Server Room Requirements and Responsibilities

1. Communications Network Requirements and Responsibilities:

The IGT sb network uses a combination of CAT-6 (up to 295ft) and/or 50 micron multimode fiber.  The 50 micron (up to 550m or 1804ft) is preferred, however if the customer already has an existing 62.5 micron (up to 275m or 902ft) it is also acceptable.  The IGT sbX system requires a dedicated communications network from each proposed bank of IGT player terminals to the customer's main computer server room.
The following specifications must be met by Customer:

The system requires a minimum of two certified CAT-6 Ethernet cables for each group of player terminals connected to a network switch (located in the base/cabinet of the player terminal).   All terminations are TIA/EIA-568B.

There is one dedicated network switch for each group of player terminals, not to exceed 11 player terminals per switch.   Switches may not be daisy-chained together to extend the network.   The requirements are 100 Mbps per game bandwidth and 1000 Mbps (1 Gbps) on the network.

All network cabling requires a service loop of no more than four wraps (360 degree loops 18" in diameter) at the network switch location and computer room/closet.

All network cables must be separated from AC power by at least 12 in unless the AC power is encased in a ferrous conduit.

The system may require an optional external WAN communications network to support the system.
Phone company representatives need access to the customer's main computer room, phone room, and phone closets so that they can terminate the IGT network communications lines.  The site (casino) point of contact is responsible for notifying the appropriate casino personnel of the expected arrival of the phone company representative for the primary and secondary communications network lines.

| CABLE SPECIFICATIONS: | |
|---|---|
| THE 50 OR 62.5 MICRON FIBER MUST MEET THE FOLLOWING SPECIFICATIONS: | THE CAT-6 CABLE MUST MEET THE FOLLOWING SPECIFICATIONS: |
| 1. Multimode fiber optics | 1. Eight conductor UTP plenum rate FTP (4 twisted pairs) |
| 2. Plenum rate cable | 2. Nominal impedance of 100 ohms |
| 3. Core/Cladding diameter 50/125 micron (up to 550m or 1804 ft) | 3. Overall cable mutual capacitance not to exceed 17.1 nF/1000ft |
| 4. Core/Cladding diameter 62.5 micron (up to 275m or 902ft) | 4. Overall cable length not to exceed 90m or 295ft |
| 5. Network type 1000 Base-SX | 5. Nominal velocity of propagation (NVP) 75% |

All
Locations:
In locations where it is not possible to accomplish a true point-to-point connection between the computer room equipment and the network equipment at the bank of player terminals via a single pull of CAT-6 cable, or if the distance exceeds 90 meters (295 ft), then IGT will accept the use of site provided multimode fiber (50 micron) communications networks that

run from distribution closets to the main computer room.  The site will provide the fiber interface equipments for both ends of the supplied multimode fiber cable.

2. **Gaming Floor Power Requirements and Responsibilities:**

IGT recommends and conducts pre and post-power analysis to ensure proper player terminal hardware performance in the casino environment.  During the initial site survey, IGT places power quality monitoring equipment at key locations within the casino to determine the quality of the site power for the server and player terminals.

**The following requirements are the responsibility of the casino:**

• The number of dedicated 20 amp  240V AC circuits required to support the player terminal installation depends on the number of player terminals, power supply configuration of the player terminal installed at each carousel, and the capacity of the dedicated circuits. Under normal operating conditions, **IGT Engineering specifications require no more than four player terminals, a bank controller, and/or a network switch be connected to a single 240 Volt 20 amp dedicated branched circuit. The specifications also require that no more than eight player terminals, a bank controller, and/or a network switch be connected to a 240 Volt 20 amp dedicated service.**
• The power must meet the following specifications:
       1. Voltage between +/-10% of 240V under full 16 amp plug in load.
       2. Total harmonic distortion of no more than 5%.
       3. Shared neutrals with other circuits should be over sized wire per **NEC.**
• A separate 20 amp circuit must be provided for any additional overhead signage.
• A quality power distribution strip must be used from the dedicated 20 amp house wall or floor outlets to the IGT player terminals, bank controllers, and/or network switches.

3. **Computer Room/Server Room Requirements and Responsibilities:**

The server equipment uses a standard **HP 1000 series computer rack (24"W x 39.5"D x ?"H)*** with front and back channel rails for hardware mounting.  ***Note: the height of the rack is determined during the site survey.***

The site's computer room must be environmentally controlled and kept between 65 and 70 degrees **Fahrenheit (18 to 21 degrees Celsius).**

The IGT server equipment requires two 240V AC dedicated 30 amp circuits in the server room, each terminated with a **NEMA L5-30R** (twist-lock) receptacle.

**Exhibit E**
**SLO Schedule**
**Standard Service Level Objectives ("SLO") and Prioritization**

Customer acknowledges that it has responsibility for the day-to-day operation of the Product, and that its designated support representatives will:

- Provide ongoing training and support to Customer's users of the System;
- Monitor, manage and maintain System in accordance to the guidance provided by IGT;
- Perform incident, problem, and change management as agreed upon with IGT.

For matters outside of the above, Customer's help desk representative and the property representative experiencing the incident should call the IGT Support Center ("IGT SC") which operates 24 hours a day, 7 days a week.

Following Customer's contact, the IGT SC will handle and prioritize the call in the following manner:

**PRIORITY LEVELS**

**Priority ONE (P1)**
A Priority 1 incident is a matter that causes or is expected to imminently cause Customer to experience a complete loss of service from the Product resulting in a halt to Customer's mission critical operations.

**Priority TWO (P2)**
A Priority 2 incident is a matter that causes Customer to experience a severe loss of service from the Product resulting in significant impact to Customer's operations. A Priority 2 incident is not expected to imminently develop into a Priority 1 incident.

**Priority THREE (P3)**
A Priority 3 incident is a matter that causes Customer to experience a minor loss of service from the Product resulting in inconvenience to Customer's operations. A Priority 3 incident is not expected to imminently develop into a Priority 2 incident.

**Priority FOUR (P4)**
A Priority 4 incident is a matter that involves a request for information, an enhancement or a clarification regarding the Product, but there is no operations impact or loss of service from the product. A Priority 4 incident is not expected to imminently develop into a Priority 3 incident.

While IGT will use good faith efforts to achieve the service level objectives set forth below, Customer acknowledges that such levels are targets only. In no event shall IGT be liable to Customer for service level credits, damages or other remedies for failure to achieve such service level objectives.

| | RESPONSE TIMES | | | |
|---|---|---|---|---|
| Applicable time frames are based upon the Priority level defined above. | P1 | P2 | P3 | P4 |
| Level 1 Support will determine if they can resolve the incident within the applicable time frame following the initial call. If Level 1 cannot resolve the incident, they will escalate the incident to Level 2 Support. | 15 min. | 1 hour | 4 hours or Next Business Day | Next Business Day |
| Level 2 Support will begin working on the incident within the applicable time frame following escalation from Level 1. Once engaged, Level 2 Support will work with the Customer by telephone and/or ask for a remote access connection to the System. If required, Level 2 Support will work with the Customer to make arrangements for onsite support. If Level 2 cannot resolve the incident, they will escalate the incident to Level 3 Support. | 15min. | 1 hour | Next Business Day | Next Business Day. |
| Level 3 Support will begin working on the incident within the applicable time frame following escalation from Level 2. Once engaged, Level 3 Support will work continuously on the incident until it is resolved. | 15 min. | 1 hour | Next Business Day | Next Business Day |

- IGT will regularly communicate with the Customer on the status of the incident until the incident is resolved.

- IGT will contact Customer when they have a plan to resolve the incident for review and approval by Customer.

In the event that resolution of the incident requires Product modifications or development, IGT will use commercially reasonable efforts to provide a mutually agreed upon solution.